## THE HAWLEY DOWN DRAFT FURNACE COMPANY *vs.* WILLIAM E. HOOPER & SONS.

*Contracts—Parol Evidence of Collateral Agreement—Sale of Furnace With Warranty—Evidence—Authority of Agent.*

A contract for the erection by plaintiff of furnaces for defendant's boilers contained a warranty that the furnaces would " save 12 per cent in the cost of fuel over present method of making steam using same coal." The contract contained no provision as to the method by which the test was to be made to determine if the economy warranted was effected. Several tests were made according to one of which the warranty had been performed and according to the others it had not been. Defendant notified plaintiff of the rejection of the furnaces and took them out. In an action for breach of the contract. *Held,*

1st. That parol evidence is admissible to show a verbal agreement between the parties that the test of the furnaces was to be an every-day or comparative test.

2nd. That the jury was properly instructed that the burden of proof was upon the plaintiff to show that upon a fair, practical test the furnaces effected the saving in fuel guaranteed by the contract, and that if such saving was not effected, then their verdict must be for the defendant.

In an action to recover the price of a machine sold with a warranty where defendant alleges that the warranty was not performed, and where he did not accept the article, no evidence is admissible of an offer by defendant to take the article at a price less than the contract price, when the offer was not accepted by the plaintiff and when subsequent attempts were made to cause the machine to work according to the warranty.

A party who had agreed to erect a machine for defendant, warranted to produce a certain result, asked to have another test of it made after the failure of previous tests. Defendant referred him to an Assistant General Manager to "make arrangements." *Held*, that such Assistant General Manager had no implied authority to make an agreement concerning the machine, which varied the contract for the same made by defendant.

Appeal from the Superior Court of Baltimore City, (RITCHIE, J.) The defendant's third prayer, which was granted, instructed the jury that the burden was upon the plaintiff to show by a preponderance of testimony satisfactory to the jury, that upon a fair and *bona fide* practical test, the furnaces placed by the plaintiff in the Meadow Mill, under the contract offered in evidence, effected a saving of 12 per cent in cost of fuel over the method of making steam used by the defendants at the Meadow Mill at the time said contract was entered into ; and that if the plaintiff has not met the burden of proof by a preponderance of testimony satisfactory to the jury, the plaintiff cannot recover in this action, and the verdict of the jury should be for the defendants.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD and SCHMUCKER, JJ.

*Joseph C. France* (with whom was *J. Kemp Bartlett, Jr.*, on the brief), for the appellant.

*Frank Gosnell* (with whom was *T. M. Lanahan*, on the brief), for the appellee.

PAGE, J., delivered the opinion of the Court.

This appeal is from a judgment of the lower Court, in favor of the appellees in a suit brought by the appellants for an alleged breach of contract.

On the 23rd of April, 1896, the plaintiffs offered in writing to furnish the defendants for their water-tube boilers in use at Meadow Mills two Hawley Down Draft Furnaces,

for the sum of fourteen hundred dollars.   The masonry work in removing- and replacing necessary brickwork was to be done by the defendants, and the plaintiffs to furnish all other work and materials.

The contract contained the following guaranty, *viz :*

" 1st. To prevent at least 95 per cent of·the smoke, burning any grade of bituminous coal.

2nd. To increase capacity of boiler—per cent over the rating.

3rd. Burning bituminous coal will save 12 per cent in cost of fuel over present method of making steam, using same coal.

Terms in three equal payments.

1st. Thirty days from fulfilment of contract.

Balance in 60 and 90 days.

Should our furnaces fail to do as guaranteed, we hereby agree to remove them and replace the former setting at our expense."

This contract was duly accepted in writing by the defendants and by the middle of the following July, the furnaces had been installed and put in use.   The first test of them was made on the twenty-first and twenty-second day of August following.   Four boilers were employed; two with the Hawley furnaces, and two without them were alternately run, and a comparison was made as to the amount of coal and water consumed in each pair.   By this test the economy in favor of the Hawley furnaces was a little over nine per centum, and therefore under the saving called for by the contract.   The suggestion was then made that the failure to get the required percentage was due to the use of the " Westinghouse loop," and thereupon that was removed and another test was made òn the seventh and eighth of June, 1897 ; this showed an economy of only six per centum.   Subsequently the vice-president of the plaintiff corporation· said to Mr. James E. Hooper that " he wanted to make a change in the brick arch under the Hawley furnaces and was sure when the arch was changed it would

give the guaranteed economy." Thereupon the arch was changed, and with the consent of the defendants a third test was made by Professor Geer. As to the circumstances connected with this test, its efficiency and accuracy, there was much conflict in the evidence. The plaintiffs insist that the proof shows that it was agreed by both parties that it should be final, that it was skillfully and accurately made, and that it proved an economy of over twelve per cent in favor of the Hawley furnaces. The defendants, however, denied all this and offered evidence to sustain their denial, and to prove that it was not properly conducted, that it was not such a test as was contemplated by the contract or by the parties, and that it had not been agreed that its results should be accepted as a final determination of the matter. On the eleventh day of September, 1897, the defendants wrote to the plaintiffs asking them to remove the furnaces and upon their failure to do so they were taken out by the defendants. Thereupon this suit was brought and the verdict and judgment being against them they have appealed to this Court.

At the trial the witness, Vick, having given testimony as to the contract and the several tests, further testified that in the spring of 1897 he had a conversation with Mr. James E. Hooper, a member of the defendant corporation, in which Mr. Hooper had said that he had "made some tests by evaporating the water, weighing the water and coal," in the same way the plaintiff had made them and that the economy was about 6 6-10 per cent, and that at the time of this interview there had been " no threats or reference to litigation," &c. He was then asked by the counsel for the plaintiff whether " at this conversation," Mr. Hooper made "any offer for the furnaces as they then stood." To the refusal of the Court to allow this question to be put, on the objection of the defendants' counsel, the plaintiff reserved his first exception. Before the Court had ruled upon the objection, the plaintiff's counsel stated that the question was asked for the purpose of showing, 1st " an acceptance

for which recovery could be had under the *quantum meruit*," and 2nd that " the defendants had recognized the propriety of the method of the plaintiff's first test, by offering to pay for the furnaces at a figure based upon the economy showed by said test, to-wit, one thousand dollars, which proposition was rejected by plaintiff, it saying it would rather spend the difference in determining what the mistake was."

· At the time when this testimony was offered there had been no evidence tending to show an acceptance on the part of the defendants. The furnaces were, it is true, in the possession of the defendants, but they held them only provisionally, that is, subject to the conditions of the guaranty. Until these conditions had been complied with, there was no obligation to accept and if the furnaces failed " to do as guaranteed," by the terms of the contract itself, the plaintiffs were bound to remove them and replace the former setting at their own expense. · The proposed proof had no tendency in itself to prove an acceptance and no offer was made to subsequently establish it. In fact so far from making such an offer, the statement of the plaintiff's counsel shows that if Mr. Hooper did actually propose to pay for the furnaces at a figure based upon the economy showed by the test, that the plaintiff rejected the proposition with the statement that rather than accept, it would spend the difference in determining what the mistake was. Under these circumstances it is difficult to perceive how it could affect any of the issues of the case, if such an offer had been made by Mr. Hooper. It was certainly quite immaterial to the rights of the defendants whether he recognized the propriety of the method of the first test or not. The result as shown by that test was unfavorable to the plaintiff, they had not shown a sufficient degree of economy. If the recognition of Mr. Hooper bound his firm, the only effect of it was to absolve the defendants from further liability under the contract and to impose on the plaintiffs the duty of removing the furnaces ; or if the

defendants thought the test insufficient they could if they chose have a second test, to which the plaintiffs would not probably object, the first test having resulted so detrimentally to them. In any aspect of the case the evidence was inadmissible and properly rejected by the Court.

The second and third exceptions present the same questions and may be considered together. They question the correctness of the action of the Court in permitting evidence to go to the jury tending to prove that there had been a contemporaneous verbal understanding between the parties as to the test to be made in determining whether the guaranty had been fully met. Mr. William E. Hooper testified that it was understood that the test was " not to be a scientific test," but one by which " the coal consumed in the furnaces before the Hawley furnace was put in," should be compared " with the coal consumed after the Hawley furnace was put in." Mr. James E. Hooper testified that it was agreed there should be " an ordinary, every-day, comparative test, measured by the number of tons of coal consumed by our boiler that went in before, as compared with what went in afterwards."

We have seen that several tests were actually made. The first two were " evaporative tests," as referred to in the evidence. The two boilers with the Hawley furnaces were separated from the two others ; all the water and coal were carefully weighed and measured ; and the result was arrived at by comparing the quantities respectively used in each battery. There was also a test made by the defendants, which consisted in keeping a record of the quantity of coal consumed in each pair of furnaces, and after the lapse of some time making comparisons of the cost of the coal consumed in each. This, it may be presumed, was the " ordinary, every-day, comparative test," to which the Hoopers refer in their testimony. Finally there was also the test made by Professor Geer ; and inasmuch as he says it was " conducted according to the standard method of starting and stopping recommended by the American Soci-

ety and Mechanical Engineers' Committee," it may fairly be regarded as the "scientific test." The results of this, the last test that was made, showed an economy in favor of the Hawley furnace of over twelve per cent, while by all of the other tests, there was a failure to meet the requirements of the contract. Moreover the plaintiff's witness, Vick, had testified that it was verbally understood between the parties that the test was to be "a practical one," and there was other evidence to show that Professor Geer's scientific test was "simply" a practical one. Which of these tests, with their divergent results, was the jury to determine upon as the proper one? The contract, as written, threw no light upon the question. It contained the guaranty, in plain terms, that the Hawley furnace "burning bituminous coal will save 12 per cent in cost of fuel over present method of making steam, using same coal," but as to how the saving should be ascertained it was absolutely silent. The method of testing was in fact entirely outside the written contract, for if the plaintiff showed to the satisfaction of the jury that there was in fact a saving of 12 per cent, according to the terms of the writing, it would be quite immaterial by what test the saving was ascertained and measured. So that there would be no interference with the writing, if it should be proved there was a contemporaneous verbal understanding that there should be a test of a particular kind. ,This case therefore is clearly within the ruling in *Basshor & Co.* v. *Forbes*, 36 Md. 166, where this Court said: "It is well settled by the most unquestionable authorities that proof is admissible of any collateral, parol agreement or independent fact, which does not interfere with the terms of the written contract, though it may relate to the same subject-matter; and whether such collateral agreement was made, or independent fact occurred, contemporaneously with, or as preliminary to, the main contract in writing, is quite immaterial." The counsel for the plaintiff contended that this well-settled principle should not be made to apply in this cause, because if the testimony of

the Hoopers was allowed to go to the jury, and was be-
lieved by them, it would have the effect of enlarging the
guaranty as written in the contract as to make it in fact a
guaranty of the saving according to the defendant's method
of using and measuring the coal. The same objection
could have been made upon the theory of the counsel, if
the evidence offered had been to establish a verbal agree-
ment for a practical, or an evaporative, or a scientific or any
other test. But no matter what the test was, the jury must
be satisfied that there was in fact a saving of 12 per cent in
the cost of coal before they could find their verdict for the
plaintiff. Even if they believed that the parties had agreed
to have an " ordinary, every-day, comparative test" it
would still be their duty to inquire whether the test that
was actually made, was sufficiently accurate to enable them
to find with reasonable certainty whether there had been an
actual saving as required by the written contract. The
cases cited by the plaintiff's counsel do not sustain his con-
tention. In *Daggett* v. *Johnson*, 49 Vt. 345, the written
contract was : " I agree to pay you if *satisfied* with the
pans." It is perfectly clear that with a contract like that
it is not admissible to offer evidence of a verbal agreement
that the pans were to be " of a particular form," to be
" used in a particular manner and applied to a particular
test." The Court held that such proof would tend to
change the written contract from an agreement to pay if the
buyer was satisfied with the pans, to a promise dependent
upon the shape of the pans and the uses and tests to which
they might be put and applied. So in *Exhaust Vent. Co.* v.
*C. R.*, 69 Wis. 454, the machinery was purchased " on ap-
proval;" it was held inadmissible to show a verbal agree-
ment " as to a particular mode of testing the same." The
case of *Seitz* v. *Brewers' Refrigerating M. Co.*, 141 U. S.
510, is in full accord with what we have said. There the
suit was to recover on a written contract for the sale of a
machine ; the defence was the breach of an alleged verbal
warranty that the machine should be fit to accomplish a

certain result, but it was held that "to admit proof of such an engagement by parol would be to add another term to the written contract, contrary to the settled and salutary rule upon that subject." In the case with which we are now dealing we have seen that the effect of the evidence objected to cannot add to or take anything from the written contract, but only tends to establish "the existence of a separate oral agreement as to a matter on which the written contract is silent and which is not inconsistent with its terms" (*supra*). There was no error therefore in the rulings set out in these two exceptions.

The fourth and last exception bring in review the several instructions of the Court. Two prayers were granted on behalf of the plaintiffs and three for the defendants, being their first, third and sixth.

The objection to the first prayer of the defendants is because, as the plaintiff's counsel insists, it directs that the saving of coal was to be measured "by comparing the combined coal consumption of the two batteries after the change in one of them with the combined consumption before such change," whereas the proper method was "by comparing a battery of boilers equipped with the Hawley furnaces and a similar battery not so equipped." But we do not think that criticism is based upon a correct construction of the terms of the prayer. The jury are distinctly instructed that there can be no recovery, if they shall find "that after a fair practical test of said furnaces, it was demonstrated that the defendants were not saved twelve per centum in cost of fuel as against their two old furnaces, which were removed for the purpose of placing the plaintiff's furnaces at the Meadow Mill," &c., thus clearly stating that the saving was to be measured by comparing a battery of boilers equipped with the Hawley furnace, with the same battery before the change was made. In addition to this, this prayer was granted in connection with the plaintiff's first prayer, by which the jury was told "that the plaintiffs were bound only to produce a twelve per centum economy of

consumption in the battery of boilers to which the Hawley furnaces were affixed, as compared with the same or a similar battery or pair, having the former style of furnaces."

There was no error in granting the defendant's third prayer.    The plaintiffs were bound to make out their case by a preponderance of evidence.    *Laubheimer* v. *Naill*, 88 Md. 181.

The sixth prayer of the defendants presented two propositions ; 1st, that there was no legally sufficient evidence of an agreement that the third or Geer test should be final and binding on the defendants ; and 2nd, that if there was, such an agreement was without consideration and void.

The evidence relied on by the plaintiffs is to be found in the conversations of Bleyer with William E. Hooper, who was not a member of the defendant firm and was connected with its affairs only as assistant of his father, James E. Hooper, one of the defendants, and the general manager of Meadow Mills.    In the absence of proof showing what his general authority was, it cannot be contended (and it is not) that a mere assistant of a general manager has power to make any contract for the concern.    But it is insisted that his authority to make this specific agreement, was conferred by James E. Hooper in the course of his conversation with Bleyer.    Vick's account of this was that Bleyer said to Mr. James E. Hooper, that he (Bleyer) desired to change the arch and make a new trial, "a final effort, one more effort," to see "if it would not come up to the guarantee, or the furnace would be taken out," and Hooper replied, "go out there (Meadow Mills) and whatever *arrangements* we (the plaintiffs) made with his son would be satisfactory to him." Bleyer's statement is not substantially different.    The purport of the whole matter seems to be that Bleyer desired to have a further test, and with a view of securing it he visited a member of the defendant firm, who, after he had given his consent that a new trial of the furnaces should be made, told Mr. Bleyer to see the assistant manager and he would make "all arrangements with him."    The "arrange-

ments" here referred to are such as would be necessary in removing the arch and running the batteries so that comparisons could be made. It will require an unreasonably strained construction to interpret the word in its connection and under the circumstances of the case, to mean that it conferred or was intended to confer authority upon the assistant manager to make a contract binding on the defendants that the trial or test about to be made should be final and conclusive upon all parties. We do not think, therefore, that there was any evidence in the case legally sufficient to establish such an agreement. It is not necessary to examine the second proposition, for whatever may be said concerning it, inasmuch as the prayer contains at least one sufficient reason for the conclusions which it announces, it is immaterial whether or not there may be others.

From what has been said, it follows that the judgment must be affirmed.

*Judgment Affirmed.*

(Decided January 9th, 1900).